# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| In re: Samuel T. Rowell | ) | Bankruptcy No. 18-81847 |
| | ) | |
| Debtor. | ) | Chapter 13 |
| | ) | |
| | ) | Judge Lynch |
| | ) | |

## MEMORANDUM OPINION

Samuel Rowell (the "Debtor"), and Vernon and Cheryl Jones (the "Claimants")
were friends and neighbors living in Barrington, Illinois. Apparently, no longer. Now
before the court is the Debtor's objection to his former neighbors' unsecured claim of
$166,023.08. (ECF No. 36.)

Both the origins and substance of the claim are convoluted. In 2013, Mr. and
Mrs. Jones found themselves unable to keep up with their mortgage payments and
were forced to sell their home in a short sale. Believing then that the short sale would
disqualify them from obtaining conventional financing, they met with Mr. Rowell to
see if their neighbor could help. Eventually, Mr. Rowell agreed to obtain a mortgage
to finance his purchase of a home they selected. The parties agreed to a lease
arrangement whereby Mr. and Mrs. Jones would pay Mr. Rowell sufficient rent to
cover his monthly mortgage payments and expenses for about three years when they
expected they could qualify for mortgage financing to purchase the home from him.

Reaching that understanding, Mr. and Mrs. Jones provided the earnest money
for the home of their choice. With the Claimants further contributing an additional
portion of the funds needed for closing the Debtor bought the home, located in

Barrington, Illinois (the "Oak Creek Residence") and the Jones' moved in. Unfortunately, the parties did not enter into a written agreement regarding either the Jones' contribution or an option to purchase the property. They did sign a standard lease agreement before the purchase. The lease makes no mention of a purchase option or the future sale of the property. And the parties apparently did not consider what would happen if the Jones were unable to obtain a mortgage or if the Debtor sold the property to someone else. Alas, that came to pass. After offering the property to the Jones and in some financial difficulties of his own, Mr. Rowell sold the home to a third party in 2017 for a "profit."

Apparently, the sale provided little or no financial respite to Mr. Rowell and he commenced this bankruptcy case later in 2018. Mr. and Mrs. Jones assert an unsecured claim against his bankruptcy estate in the amount of $166,023.88 ("Claim 2-1") which they contend is due them under several theories. On the Debtor's objection and after an evidentiary hearing, the court finds that the Claimants are barred by the statute of frauds from asserting a claim for breach of contract for the sale of the home. Further, the terms of their lease agreement preclude much of their claim for reimbursement for repairs and improvements. However, the evidence shows that the Claimants possess a claim in restitution for the Debtor's unjust retention of their contribution that enabled him to purchase the property and of certain later contributions in connection with his 2017 sale of that property at a profit. Accordingly, Claim 2-1 will be allowed in the amount of $76,039. The remainder of the Jones' claim will be disallowed.

## JURISDICTION

This court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. The disallowance of claims is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and over which the bankruptcy court has constitutional authority to enter final orders. *See, e.g., Stern v. Marshall*, 564 U.S. 462, 499 (2011) (the question of court's authority "is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."). Additionally, at the hearing on April 4, 2019, counsel for both the Debtor and the Claimants consented on the record to this court entering final orders in the matter.

## PROCEDURAL BACKGROUND

On August 29, 2018, Mr. Rowell filed his petition for relief under chapter 13 of the Bankruptcy Code. Cheryl and Vernon Jones (the "Claimants") timely filed an Official Form 410 ("Proof of Claim") to assert their unsecured claim of $166,023.88 for what they describe as "[m]oney paid towards purchase of real estate by Debtor, which Debtor sold without repaying Creditor." (Claim No. 2-1.) They attached to their Proof of Claim a "Chronological Summary" and a spreadsheet entitled "Expenses Incurred." The Claimants included with their submission copies of invoices and estimates for roof and other home repair work together with a home inspection report. The Claimants' seek "to recover sums of money paid on behalf of the Debtor relating to a residence owned and sold prior to the filing of the Chapter 13 petition." (Claimant's Post-Trial Br. ¶1, ECF No. 96.) They now explain that the amount sought

consists of "$80,000 ... related to the down payment and earnest money for the purchase of the subject property, and the remainder was related to repairs and improvements made to the property." (*Id.* at ¶2.) While admitting that there is no writing that memorializes terms of an agreement regarding their contributions or the purchase of the Oak Creek Residence, the Claimants argue that the Debtor orally agreed to purchase the Oak Creek Residence for them using a combination of funds provided by the Jones, together with funds provided by the Debtor and a mortgage loan he would obtain, and then lease the residence to them for approximately three years when he would sell the property to them. Because the Debtor later sold the Oak Creek Residence to a third-party at an admitted profit, Mr. and Mrs. Jones argue that they are entitled to receive back the monetary benefit they conferred on the Debtor either as contractual damages or as an equitable remedy for unjust enrichment or conversion.

The Debtor objects to Claim 2-1 in its entirety. (ECF Nos. 36, 75.)[1] According to the Debtor, (i) the Claimants have failed to meet their burden of demonstrating an agreement was formed; (ii) any claim for breach of contract is barred by the Illinois statute of frauds; (iii) their claim for equitable relief is barred by the terms of the written lease agreement; and (iv) the Claimants have not met their burden to prove the damages and amounts sought. (*See generally,* Debtor's Post-Trial Br., ECF No.

---

[1] The Debtor was represented by different counsel at the time the original objection was prepared and filed, who later withdrew with this court's approval. (ECF No. 68.) The original objection included an objection that "no judgment or court order has been entered ordering debtor to pay" the Claimants any money – an objection that has not been repeated in the subsequent documents filed by new counsel, and which is contrary to the Bankruptcy Code's express definition of "claim" as including any "right to payment, whether or not such right is reduced to judgment." 11 U.S.C. § 101(5)(A). Not being pursued by the Debtor's replacement counsel, that objection will be deemed abandoned.

94.) The Claimants filed their response (ECF No. 77) and on March 14, 2019, this court entered its Final Pretrial Order. (ECF No. 84.) During the March hearing, the court reminded the parties that this contested matter appeared to raise disputed material facts and asked them whether they wished the opportunity to conduct discovery. Both parties responded that they did not. The court held an evidentiary hearing on May 21, 2019, during which the Debtor and both Vernon and Cheryl Jones testified. In addition, the court received the following exhibits without objection: a recapitulation of expenses prepared by Mr. Jones, a handwritten list of rent payments prepared by the Debtor, and the Residential Lease made by the parties. At the direction of the court, the parties later submitted post-trial memoranda. (ECF Nos. 94, 96.) The Chapter 13 Trustee participated in these proceedings but did not take a position on the merits of the claim or the Debtor's objection.

## FINDINGS OF FACT

After weighing the evidence and credibility of testimony of the witnesses and the other evidence received, giving due consideration to the argument of counsel and taking judicial notice of matters of public record and the court's own docket, the court makes the following findings of fact as set forth here and in later portions of this Memorandum Opinion.[2] *See Lulay Law Offices v. Rafter*, 579 B.R. 827, 829 n.1

---

[2] The following sets forth this court's findings of fact as required by Fed. R. Bankr. P. 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

(Bankr. N.D. Ill. Sept. 29, 2017) (citing *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991)).

In 2013, Vernon and Cheryl Jones realized they had to give up their home in a short sale. Unable to obtain traditional financing to purchase a new home, Mr. and Mrs. Jones contacted a company that finances home purchases through lease arrangements offering purchase options. The Claimants eventually elected not to go forward with that company because it would not finance the home they wished to buy, the Oak Creek Residence. They then approached Mr. Rowell, their friend and neighbor, to discuss the lease / option concept and see if he could help. At the time the Jones were under the impression that that they could qualify for a traditional mortgage three years after the short sale. They proposed to Mr. Rowell an arrangement whereby he would obtain a mortgage loan to purchase the Oak Creek Residence and rent the home to them for three years until they could obtain a mortgage and buy the residence.

After visiting several banks suggested by Mr. Jones and exploring other alternatives, the Debtor found a lender. The purchase price for the Oak Creek Residence was $345,000. In July 2013, Mr. and Mrs. Jones made the earnest money payment of $5,000 for the property. They contributed an additional $70,000 by wire transfer to fund part of the down payment at the closing on September 26, 2013.[3] The

---

[3] While there exists some conflict in the record as to the exact amount of the Claimants' down payment contribution, *see* Claim 2-1 (Chronological Summary) and the Debtor's testimony about the Claimants contributing "$75,000" to the September closing, this court finds persuasive Mr. Jones' unambiguous and unqualified testimony that after earlier making the separate lease security deposit and the $5,000 earnest money payment, he separately wired and additional $70,000 to the closing: "We gave -- I wired $70,000 to the closing of the sale directly so that we could close it on September 26th. That money was in a wire transfer." (Trial Tr. 79:18-21, May 21, 2019.) Additionally, Stipulated Exhibit A, entitled

Debtor funded the rest of the purchase money and buyer's costs at closing using the proceeds of the mortgage loan in an initial principal amount of $234,000 together with an additional $29,100 in personal funds withdrawn from his 401(k) account.[4] While the Debtor vaguely testified that he may have incurred income taxes and withdrawal penalties for these withdrawals (*see supra* note 4 and *infra* note 9), he failed to establish what specific charges he incurred to fund his purchase.

The parties did not sign or prepare any writing to memorialize their arrangement for the purchase and eventual re-sale of the Oak Creek Residence. Their testimony reveals the parties' shared understanding of basic features of the arrangement – that the purpose was to help the Jones eventually own the Oak Creek Residence while, until then, the Claimants would pay monthly rent in an amount sufficient to cover the Debtor's monthly mortgage payments, including principal, interest, and tax and insurance escrow, together with some additional profit built into the rent payment. But the evidence presented also reveals that the parties did not work out the mechanics or price for the future sale to the Claimants. For example, in describing a conversation with the Claimants the Debtor testified that while "a lot

---

"Oak Creek Recap" and prepared by Mr. Jones lists the Jones' contribution of "Closing Costs" on September 26, 2013 as only $70,000, plus an "Earnest Money Deposit" of $5,000 in July 2013. (Ex. A.)
[4] The Debtor testified that in order to qualify for the loan, he had to pay down between $5,000 and $6,000 of his credit card and other personal debts, for which he also used funds withdrawn from his 401(k). (Trial Tr. 14.) The Debtor testified that he had actually withdrawn $60,000 from the account before the closing, based on an earlier statement by Mr. Jones that he would need to fund approximately $60,000 at closing, but was informed at closing that he only needed $29,100. (Trial Tr. 15-16, 23, 60.) The Debtor stated that he incurred taxes or a penalty in the 39%-40% tax bracket for withdrawals from the 401(k) account but did not provide the court with any exact figures as to taxes or penalties he claims to have incurred with respect to his 401(k) withdrawals. (Trial Tr. 11, 41, 60-61.) He also admitted in testimony that he has never asserted a claim against Mr. or Mrs. Jones for money he supposedly lost in connection with the Oak Creek Residence transactions. (Trial Tr. 66.) At most, the Debtor has shown that on one or more occasions, Mr. Jones generally reassured him that he "wouldn't lose anything" in the transaction. (Trial Tr. 17, 44.)

of stuff that was said I didn't pay any attention, because they promised me no matter what, I wouldn't lose anything." (Trial Tr. 17:6-15, May 21, 2019.)

**The Lease Agreement.** Even though the Debtor later retained a real estate attorney to represent him and handle the closing, he admitted that the parties never put any terms in writing and never discussed what would be done if the Claimants could not secure a mortgage. (Trial Tr. 17-18.) Instead, the attorney helped the parties prepare a lease agreement which they signed on August 26, 2013.[5] The Debtor testified that the only reason there was a written lease was because the bank required it, emphasizing that he did not want to be a landlord again and was not "looking to go make another investment." (Trial Tr. 17:2-8.)[6]

The lease term began September 1, 2013, before the Debtor closed on the purchase of the residence.[7] The witnesses did not disagree that that occupancy and rent was understood to begin in October. The lease provides for a $2,500 security

---

[5] The Debtor testified that the Jones' attorney provided the form and that Mrs. Jones made the handwritten changes. (Trial Tr. 20.) He explained that he had his real estate attorney look at it and she told him everything looked standard and looked good. (Trial Tr. 21.) In contrast, Mrs. Jones testified that the Debtor's real estate attorney provided and prepared the agreement. (Trial Tr. 129-30.) The court finds Mrs. Jones' testimony more credible on this point, particularly as to whether the handwriting on the agreement was hers.

[6] The Debtor and Mr. Jones also testified that the written lease was entered into at the insistence of the Debtor's mortgage bank. (Trial Tr. 44, 80.)

[7] A wrinkle not closely examined by the parties at trial is that the evidence showed the closing date of the sale to be September 26, 2013, and yet the lease term was to begin September 1, 2013, almost a month before the Debtor owned the property. That casts in doubt whether the Claimants were really required to pay rent for a period when the Debtor did not own the house. The issue is further complicated because, while the form lease contained language to describe the amount and due date for the "rent for the first month, or part thereof," neither an amount nor a date is filled in. This appears not to have bothered the parties in 2013 given their statements about viewing the lease as more of a technicality required by the bank. Instead, they appear to have been more focused on the mortgage, with the lease a mechanism for the Claimants to fund the Debtor's mortgage payment. While the lease by its terms seems to have required a payment for September rent by the 1st/5th of September, the Debtor's testimony established that his first mortgage payment came due on October 1, 2013. (Trial Tr. 49, 58, 70.)

deposit and fixes monthly rent payments at $2,500. While paragraph 4 of the lease states that all rent is "due on or before the 1 day of each calendar month," the paragraph following states that all "rent shall be due as of the 5th day of each month and shall be considered to be late if not received by LANDLORD within five days of the date due." Paragraph 5 further provides that a late charge of $100 will be added to rent received later than the fifth day after the due date. According to the lease, the security deposit will be returned within 30 days after surrender of possession and keys, and the "Security Deposit may not be treated as advance payment of rent and TENANT shall not apply the Security Deposit as rent during the Term of this Lease unless TENANT obtains written permission from LANDLORD to do so." (Ex. C, ¶ 6.) The lease contains no option to purchase the property.

The lease further provides that

> TENANT shall keep the Premises and the Personal Property therein in a clean and healthy condition, in good working order and in accordance with any and all ordinances applicable to the tenancy at TENANT's own expense.

The parties struck form language requiring landlord consent to do "work" on the premises before signing the agreement, which instead provides that "TENANT shall make all necessary repairs to the Premises, at TENANT'S expense, whenever damage has occurred or repairs are required due to TENANT's conduct or neglect." (Ex. C. ¶ 20.) On the other hand, the lease assigns to the landlord "responsibility" for "[m]ajor maintenance and repair of the Premises, not due to TENANT's misuse, waste or neglect." (*Id.*) As to "alterations to premises," the agreement states that

> TENANT shall not make alterations to the Premises, including decorating, without the prior written consent of LANDLORD" and that "[a]lterations,

changes and improvements built, constructed or placed on the Premises by TENANT, with the exception of fixtures removable without damage to the Premises and movable personal property belonging to TENANT, shall unless otherwise provided by written agreement between LANDLORD and TENANT, be the property of LANDLORD and remain on the Premises at the expiration or sooner termination of this Lease.

(*Id.* at ¶ 21.)

**Debtor's Purchase and Claimants' Occupancy.** The sale of the Oak Creek Residence closed on September 26, 2013. (Trial Tr. 46-47,79, 130.) The Debtor was placed on the title which was recorded with the mortgage. Thereafter both the Debtor and the Claimants treated the residence as if the Claimants were its owners. The Debtor testified, for example, about the perception that it was the Claimants' home. (Trial Tr. 24-25.) Similarly, Mr. Jones testified that he understood that he and his wife would do all the work and maintain the home as they pleased, their "role" being to pay Mr. Rowell a monthly payment of $2,500 which would cover the mortgage, the insurance and the taxes on the property, all of which amounted to a little less than $2,000. (Trial Tr. 78-79.)

The Claimants had made their security deposit by at least August 13, 2013 and paid their first month's rent by September 19, 2013. In early October they moved in. The Debtor arranged for his mortgage payments to be paid by automatic transfer on the first of the month. The monthly payment which covered interest, principal and escrow for tax and insurance was initially approximately $1,900 but increased over the years due to increases in taxes and insurance premiums. (Trial Tr. 30, 57.) The testimony showed that Mr. Rowell's full mortgage payment never exceeded $2,500, though at some point exceeded $2,000. (Trial Tr. 56-57.)

The Claimants made rent payments through May 2017 when they vacated the premises at the request of the Debtor in anticipation of the sale of the property. While there is some dispute as to a few payments,[8] including whether they were timely, the Debtor failed to prove these alleged occurrences breached the terms of the lease and necessarily caused his further withdrawal of 401(k) funds.[9] Part of the dispute over rent payments appears to relate to the Claimants' attempt to apply their security deposit against a rent payment. Despite its prohibition in the lease, the Debtor acknowledged that he had not refused the application, testifying that "I didn't want to argue at that point in time." (Trial Tr. 26.)

While living in the home, the Claimants made repairs, changes and

---

[8] The Debtor testified that the Claimants missed rent payments in April 2016 and August 2016. However, the court finds Mr. Jones' testimony that to his knowledge they never missed a rent payment during their occupancy through May 2017 to be more credible. (Trial Tr. 86, 114. See also Mrs. Jones' testimony at 131.) For example, in testifying about the rent for April and August 2016, which were the only two months the Debtor had noted as "MISSING" in his Exhibit 2 – a handwritten summary he apparently prepared well after the property was sold in 2017 – the Debtor stated not that the Claimants did not make the payments, but that he did not find any copy or deposit evidence. (Trial Tr. 32:9-16.) Mr. Jones credibly testified that he sent checks in both April and August 2016. (Trial Tr. 86-87, 114.) Additionally, the Debtor's handwritten summary has several lines originally marked as missing but crossed off, which Mr. Jones testified the Debtor crossed off after he provided the Debtor with bank copies of several checks that he didn't have listed in the registry he kept. (Trial Tr. 86-87.)
[9] Additionally, the Debtor has not offered a calculation of the income tax or penalties he supposedly incurred, explained why the cost would have been recurring or why the Claimants should be charged the expense – particularly since the written lease agreement already has a provision for liquidated damages in the form of a $100 late fee. (Trial Tr. 61.) Indeed, the Debtor did not make a case for the accuracy and timeliness of his recordkeeping. His after-the-fact, handwritten summary of payments does show that rent payments may have been received after the next mortgage payment was due beginning in February 2016. But this may well have been because the "missing" payments he listed in April and August 2016 were actually received sometime before February 2016. The Debtor does not dispute that he never declared a default under the lease and never charged a late fee. While the Debtor first answered "no," when asked if he ever talked with the Jones about paying penalties for late rental payments, he then clarified his response that, "[w]ell let me say when I say no, is, I talked to Vern about it at the end, and he went ahead and said, '[w]ell than charge me each month a hundred bucks. You know it's only a couple bucks. You know, it's not that big' And I said okay, well, okay, that's one way to look at it but I'm not about to argue over it." (Trial Tr. 42:13-24.) It is unclear what the Debtor meant by "at the end," and whether this was before or after the Debtor had informed them he was attempting to market and sell the home, or if it was even after the 2017 sale.

improvements at their own expense, including replacing windows and flooring and remodeling the kitchen. (Trial Tr. 89-91.)   Their testimony revealed that they sometimes selected premium construction items because they expected to reside in the home for the rest of their lives. (Trial Tr. 133-34.) They recalled that the Debtor visited their home on numerous occasions during this time and saw the work they had done.  Although the evidence shows that the Claimants informed the Debtor of their alterations to the house, they did not obtain his written permission. The Debtor never raised an objection to this work.

The Debtor then owned other properties.  From 2013 through 2017 he took money out of his 401(k) to meet expenses for his personal residence as well as for his other properties.  Finding himself financially strapped, he revealed to the Claimants in 2016 that he could no longer handle the debt for the Oak Creek Residence.  During that year he had put his own home up for sale, finding its taxes and mortgage to be "more than [he] could afford at that time." (Tr. 33-34.)  He testified that at the time that his "asset base was just shrinking because of too much debt" and the property he was leasing to the Jones was further "shrinking" those assets. (*Id.*)  He informed the Claimants that unless they bought the house from them he would sell it to another.  The Claimants agreed to his demand and in November 2016 signed a purchase agreement, contingent on obtaining mortgage financing within 8 weeks, to buy the Oak Creek Residence for $225,000.  Mr. and Mrs. Jones then discovered that they could not qualify for a loan until May 2017, three years after the closing of their 2013 short sale. (Trial Tr. 81-82, 126-27.)

In December 2016 the Claimants and the Debtor agreed to a new purchase contract for the Oak Creek Residence for a revised sale price of $275,000. (Trial Tr. 82.) But the Claimants continued to have difficulty obtaining a mortgage loan. Finally, in January 2017 the Debtor informed the Claimants that he was retaining a realtor to market the property, warning Mr. Jones that "either you buy it or I got to sell it, and I hope I make enough money that we can recoup our investment." (Trial Tr. 35, 82-83.)

The Claimants cooperated with the realtor who showed the residence to several potential buyers during the spring of 2017. (Trial Tr. 83.) The Debtor eventually found a buyer who in early April offered $395,000 for the property. (Trial Tr. 83, 91.) The closing, originally scheduled for May 30, was delayed until July 5, 2017. In the meantime, the buyer asked the Claimants to address issues regarding the septic system and chimney. In May 2017 the Claimants arranged for the requested repair and inspection work, paying $450 to repair the septic system, $289 to clean and inspect the chimney and $300 to replace chimney flashing. (Trial Tr. 98-101.) Mr. Jones testified that Mr. Rowell did not pay for any of this, "he just said had to get it done."[10] (Trial Tr. 101.) The Debtor did not dispute the Jones' testimony that the chimney and septic problems were caused by age and were not caused by the Claimants. (Trial Tr. 99.) According to Mr. Jones, "I did not have any objection, and we wanted to sell the house. At that point in time, I realized that we needed to

---

[10] In connection with the septic work, the Claimants also testified to placing an additional $5,000 security deposit on the work. After some wrangling, that deposit was returned to them by September 2017.

complete the sale and move on with our life [sic]. . . . [W]e had a buyer, and I didn't want to lose that buyer." (Trial Tr. 101-102.) The Debtor did not dispute the Jones' account of being told they had to vacate the property before the end of May and their claim that it was not their choice to make these repairs.[11] After being told that they needed to vacate the property for the pending sale, the Claimants moved out on May 29, 2017.

As mentioned, the closing took place on July 5, 2017. While it is undisputed that the purchase price was $395,000, the court is struck by the dearth of evidence about the details of the purchase the parties have provided to the court. For example, both parties admit to familiarity with the settlement statements for the 2017 sale as well as the Debtor's purchase of the property in 2013, and do not dispute the availability of records for principal and interest payments on the 2013 mortgage. But neither side offered much in the way of specific evidence about these. Instead, when asked at trial by his attorney what his "net profit" on the sale of the house in 2017 was, the Debtor replied that he "believe[d] it was $90,000." (Trial Tr. 56.) Neither party offered evidence to show that any closing costs or third-party distributions were made from the $90,000 "net gain" from the sale. The Debtor admitted in testimony that he did not make any repairs to the property or at any time "put in any money towards the maintenance of its condition." Although the Debtor vaguely referred to

---

[11] The Debtor did not contradict Mr. Jones' testimony. The Debtor testified that he required the Claimants to be out of the house before the sale closed. He also testified that the repairs were necessary and without them the buyer would not go forward with closing. The Debtor acknowledged in his testimony that nothing in the lease required the Claimants to fund the escrow for the 2017 sale. He acknowledged in his testimony that the Claimants were working with him to do whatever was necessary "in order to maximize any profit, that's what had to be done to make the sale. And he agreed with me to do it." (Trial Tr. 64.)

his later individual tax liability arising from the sale, neither he nor the Claimants have presented evidence to controvert his testimony regarding the net profit from the sale. The parties also do not dispute that the Debtor has not paid them any portion of this, nor has he reimbursed them for any of the repairs and improvements which they claim. Accordingly, this court finds that the Debtor received a "net profit" of $90,000 from his sale of the Oak Creek Residence in July 2017.

## DISCUSSION

A claim against the bankruptcy estate for which a proof of claim is properly filed "is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a). If an objection is properly raised, the bankruptcy court,

> after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

11 U.S.C. § 502(b)(1).

1. The Claim Presumptively Valid.

The Debtor argues at the outset that the contested proof of claim "was not filed in accordance with the applicable Bankruptcy rules, which would eliminate the *prima facie* presumption of the validity of the claim." (Debtor's Post-Trial Br., ECF No. 94.) A proof of claim "executed and filed in accordance with [the Bankruptcy Rules] shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). However, while "Federal Rule of Bankruptcy Procedure 3001(f)

provides that a proof of claim . . . is 'prima facie evidence of the validity and amount of the claim,' this rule does not address the burden of proof when a trustee disputes a claim." *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 22 n.2 (2000). Instead, the ultimate burden of proof generally remains the same as that imposed by the underlying substantive law. *See Raleigh*, 530 U.S. at 17 ("We hold that bankruptcy does not alter the burden imposed by the substantive law."). As this court has previously explained,

> The objector to a claim bears the initial burden of rebutting the presumption of validity. Once the objector has produced some basis for calling into question [the] allowability of a claim, the burden then shifts back to the claimant to produce evidence to meet the objection and establish that the claim in fact is allowable. However, the ultimate burden of persuasion always remains with the claimant to prove entitlement to the claim.

*In re DeKroon*, 593 B.R. 778, 781–82 (Bankr. N.D. Ill. 2018) (internal citations and quotation marks omitted).

The Debtor does not fully explain how the proof of claim filed by Vernon and Cheryl Jones is deficient such that the presumption of validity does not apply. The docket reflects that Claim No. 2-1 was filed on September 18, 2018, well before the November 7, 2018 claims bar date. The Debtor argues that certain supporting documentation which the Claimants attached to their claim "lack any foundational support" and that the amounts presented in the documentation total $156,234.88 – $9,789.08 less than the amount stated in the Proof of Claim. However, nothing in the Bankruptcy Rules required the Claimants to file supporting documentation with their proof of claim. Rule 3001(c)(1) requires claims "based on a writing" to include a

copy of the writing, further providing that a claim that "in addition to its principal amount ... includes interest, fees, expenses, or other charges incurred before the petition was filed" must include an "itemized statement of the interest, fees, expenses, or charges." Fed. R. Bankr. P. 3001(c)(1).

In the present case it is apparent that the claim arises from an oral agreement and is not "based on a writing." While there is a written lease agreement regarding the Oak Creek Residence, Mr. and Mrs. Jones do not base their claim on it. Nor do they seek pre-petition "interest, fees, expenses, or other charges incurred" as those terms are used in Rule 3001(c). Although a portion of their claim relates to improvements or repairs allegedly made to the residence, that constitutes part of the principal amount of the claim asserted and not "expenses incurred before the petition was filed" which are "in addition to [a] principal amount." Fed. R. Bankr. P. 3001(c)(2)(A). Indeed, as discussed further below Mr. and Mrs. Jones' quantum meruit or unjust enrichment claim is based primarily on the value that the Debtor allegedly *received* through the repairs and improvements, not the cost incurred by the Claimants. As such, the Debtor fails to show that Claim 2-1 presents prima facie evidence of the validity and amount of the debt asserted by the Claimants.

2. <u>The Statute of Frauds Bars Portions of the Claim.</u>

Under Illinois' statute of frauds, no

> action shall be brought to charge any person upon any contract for the sale of lands, tenements or hereditaments or any interest in or concerning them, for a longer term than one year, unless such contract or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing, signed by

such party.

740 Ill. Comp. Stat. Ann. 80/2.[12] The Illinois statute, which "tracks the language of

the original English Statute of Frauds and Perjuries," seeks to prohibit "fraudulent

practices, which are commonly endeavored to be upheld by perjury and subordination

of perjury ... by barring actions based upon nothing more than loose verbal

statements." *McInerney v. Charter Golf, Inc.*, 680 N.E.2d 1347, 1351 (Ill. 1997).

"In order for a writing to satisfy the statute of frauds, the writing must

demonstrate the existence of a contract and contain all of its essential terms and

conditions." *Berkowitz v. Urso*, 24 N.E. 3d 196, 208 (Ill. App. Ct. 2014) (citing *Storm

& Assocs., Ltd. v. Cuculich*, 700 N.E.2d 202 (Ill. App. Ct. 1998)). While it is

undisputed that the Debtor and the Claimants signed a written lease agreement

regarding the Oak Creek Residence on August 26, 2013, the Claimants do not assert

a claim based on it. The lease agreement makes no reference to any sale option or to

the Claimants contributing any amounts towards the initial purchase of the property.

(Ex. C.) Nor is the portion of their claim for repairs and improvements based on the

written lease. Instead, the lease agreement generally provides that the tenant bears

the cost of repairs. (*Id. ¶ 20.*) To be sure, under the lease "major maintenance and

---

[12] The Debtor also argues that no enforceable contract arose because the parties failed to reach a
meeting of the minds and had not agreed on a number of material terms, including the method of
calculating an option price, when the Claimants could exercise that option and when it expired, and
what - if any, right that the Claimants had to the proceeds or for reimbursement should the residence
be sold to a third party. As the Seventh Circuit has explained, "[n]o contract exists under Illinois law,
. . . if the agreement lacks definite and certain terms; nor is a contract formed by an offer that itself
lacks definite and certain material terms and does not require such terms to be supplied by an
acceptance." *Ass'n Ben. Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 850 (7th Cir. 2007). Because
the court finds that the Debtor's asserted defense of the statute of frauds applies, the court will not
further consider whether the parties' oral discussions created a binding contract under Illinois law.

repair ... not due to TENANT's misuse, waste or neglect, shall be the responsibility of LANDLORD." (*Id.*) However, the lease requires prior written consent of the landlord before all "alterations, changes and improvements built, constructed or placed on the Premises by the TENANT," and that any nonremovable improvements become property of the landlord unless provided otherwise by written agreement. (*Id.* at ¶ 21.)

It is evident, then, that the Claimants rely on an oral agreement for their claim. It is undisputed that the oral agreement they rely on involves the arrangement with the Debtor to purchase the Oak Creek Residence for the purpose of selling it to them in three years when they could qualify for a mortgage. This oral agreement is undisputedly a "contract for the sale of lands, tenements or hereditaments or any interest in or concerning them, for a longer term than one year." Thus, to the extent that Claim 2-1 is based on this agreement regarding the eventual sale of the Oak Creek Residence, it is within the statute of frauds.

The Claimants, however, further argue that their contribution of the earnest money and the agreed-to portion of the down payment at closing constitutes partial performance of the parol agreement, thereby excepting their contract claim from the statute's prohibition. However, under Illinois law a "party's partial performance generally does not bar application of the statute of frauds, unless it would otherwise be 'impossible or impractical to place the parties in status quo or restore or compensate' the performing party for the value of his performance." *McInerney v. Charter Golf, Inc.,* 680 N.E.2d 1347, 1352 (Ill. 1997) (internal citation omitted). *See*

*also Fischer v. First Chicago Capital Markets, Inc.,* 195 F.3d 279, 283 (7th Cir. 1999). As explained by the Illinois Supreme Court, this "so-called exception resembles the doctrines of restitution, estoppel and fraud, and exists to avoid a 'virtual fraud' from being perpetrated on the performing party." *McInerney,* 680 N.E.2d at 1352.

The partial performance exception is "an equitable remedy and therefore is unavailable to [a plaintiff] who seeks only money damages." *Fischer v. First Chicago Capital Markets, Inc.,* 195 F.3d 279, 283 (7th Cir. 1999) (citing *Vuagniaux v. Korte,* 652 N.E.2d 840, 844 (Ill. App. Ct. 1995); *Dickens v. Quincy College Corp.,* 615 N.E.2d 381, 385 (Ill. App. Ct. 1993); *Gibbons v. Stillwell,* 500 N.E.2d 965, 969 (Ill. App. Ct. 1986). This is because "to remove the bar of the statute of frauds, partial performance must be such that it is impossible to compensate the performing party for the value of his performance, so that any refusal to complete the engagement would constitute a fraud on the performing party." *Emerick Farms v. Marlen,* 2017 IL App (5th) 160260-U (Ill. App. Ct. 2017) (citing *Prodromos v. Howard Sav. Bank.,* 295 Ill. App. 3d 470, 476 (Ill. App. Ct. 1998)). Here the Claimants assert a claim for money damages for their down payment and earnest money contributions to the purchase of the property and for their later expenditures for repairs and improvements. Doing so, they acknowledge the possibility of compensation for the value of their performance. Accordingly, their contract claim is barred by the statute of frauds.[13]

---

[13] Nor may the Claimants seek to enforce the contract based on partial performance under a theory of promissory estoppel. "Under Illinois law, the statute of frauds is applicable to a promise claimed to be enforceable by virtue of the doctrine of promissory estoppel." *Fischer v. First Chicago Capital Markets, Inc.,* 195 F.3d 279, 284 (7th Cir. 1999) (citing *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.,* 58 F.3d 1227, 1231 (7th Cir.1995)).

3.  <u>Restitution and Unjust Enrichment</u>.

The Claimants next assert that they may maintain a portion of their claim under a theory of restitution and unjust enrichment. The common law recognizes in certain circumstances a claim in restitution for a person who renders performance in reliance upon an unenforceable contract. According to the Restatement:

> A person who renders performance under an agreement that cannot be enforced against the recipient by reason of
> (a) indefiniteness, or
> (b) the failure to satisfy an extrinsic requirement of enforceability such as the Statute of Frauds,
> has a claim in restitution against the recipient as necessary to prevent unjust enrichment. There is no unjust enrichment if the claimant receives the counterperformance specified by the parties' unenforceable agreement.

Restatement (Third) of Restitution and Unjust Enrichment § 31 (2011).[14] Sometimes described as a claim for "quantum meruit",[15] claims for restitution by money judgment were also previously known as "quasi-contract" claims or claims on "contracts implied in law."[16] *Id.* at § 4, comments a, b.

---

[14] The Restatement notes that the term "restitution," as employed "to denote liability based on unjust enrichment" is "a term of art that has frequently proved confusing," particularly due to the term's alternate or "literal meaning of 'restoration.'" *Id.* at § 1, comment c. Notably, "there are significant instances of liability based on unjust enrichment that do not involve the restoration of anything the claimant previously possessed" and "numerous situations in which a claimant's undoubted right to the restitution (or restoration) of something does not depend on the unjust enrichment of the defendant." *Id.*

[15] While "the pleading called quantum meruit retains broad currency in modern U.S. courts" and is often used for restitution claims on unenforceable contracts, many other "claims labeled 'quantum meruit' have no essential connection to the law of restitution and unjust enrichment." *Id.* at §31 comment e. For example, a recovery called "quantum meruit" also describes a contract remedy to "enforce[] an implied term of an actual contract." *Id.* Partially because of the dual function of the term and pleading, "[j]udicial opinions abound in contradictory statements about the nature and function of a recovery in quantum meruit." *Id.*

[16] This is as opposed to a contract "implied in fact," which is treated as "a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *Marcatante v. City of Chicago, Ill.*, 657 F.3d 433, 440 (7th

Although not altogether consistent in their terminology,[17] Illinois courts[18] have recognized the existence of a claim in restitution for performance on an unenforceable contract, including on the basis of the statute of frauds, to avoid unjust enrichment. For example, in *Cove Management v. AFLAC, Inc.,* the court, noting that "*[q]uantum meruit* is used as an equitable remedy to provide restitution for unjust enrichment," noted that *quantum meruit* is often pled in Illinois "as an alternative claim in breach of contract actions so that the plaintiff may recover even if the contract is unenforceable." 986 N.E.2d 1206, 1215 (Ill. App. Ct. 2013) (citing *Weydert Homes, Inc. v. Kammes,* 917 N.E.2d 64 (Ill. App. Ct. 2009)). Similarly, in *K. Miller Construction Co. v. McGinnis,* the Illinois Supreme Court held that a writing requirement under the Home Repair and Remodeling Act did not bar recovery in *quantum meruit* on an oral contract for home remodeling work. 938 N.E.2d 471 (Ill. 2010).

The Illinois Supreme Court has described a quasi-contract as "'no contract at all,' but a 'rule of law that requires restitution to the plaintiff of something that came

---

Cir. 2011) (citing *A.E.I. Music Network, Inc. v. Bus. Computers, Inc.,* 290 F.3d 952, 956 (7th Cir. 2002) (quotations omitted); *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.,* 599 F.3d 720, 726 (7th Cir. 2010)).

[17] For example, in *Gagnon v. Schickel,* the court states that "[u]njust enrichment is not an independent cause of action," but then goes on to say in the next sentence that "it may be based on contracts which are implied in law." 983 N.E.2d 1044, 1052 (Ill. App. Ct. 2012). *See also Nazy v. Leonardi,* 2016 IL App (1st) 134044-U (Ill. App. Ct. 2016) (rejecting unjust enrichment claim for money provided to fund down payment as inconsistent with "gift letter" executed by plaintiff).

[18] Neither party disputes that Illinois law applies. Because a "quantum meruit claim sounds in restitution rather than contract, we look to the restitution section of the Restatement [which] provides that the law of the state with the most significant contacts governs." *Vance v. Gallagher,* 280 Fed. Appx. 533, 537 (7th Cir. 2008). Here, the domicile of all parties, the location of the land "substantially related to the enrichment ... at the time of the enrichment," the location of the act conferring and receiving the enrichment, and the place the relationship between the parties was centered were all in Illinois. *Id.* (citing Restatement (Second) of Conflict of Laws § 221(2)). Therefore, all contacts point to Illinois law to control.

into the defendant's hands but in justice belongs to the plaintiff.'" *Vill. of Bloomingdale v. CDG Enterprises, Inc.*, 752 N.E.2d 1090, 1102 (Ill. 2001) (quoting D. Dobbs, Dobbs Law of Remedies § 4.2(3), at 580 (2d ed. 1993)). Such an action "is based on the principle that no one ought to enrich himself unjustly at the expense of another." 752 N.E.2d at 1102. An action on a quasi-contract "is governed by principles of equity, although the action is at law." *Bd. of Highway Comm'rs, Bloomington Twp., v. City of Bloomington*, 97 N.E. 280, 285 (Ill. 1911). Quantum meruit has been described as "a quasi-contract doctrine that allows courts to imply the existence of a contract to prevent injustice." *Hess*, 668 F.3d at 455 (citing *Hayes Mech., Inc. v. First Indus., L.P.*, 812 N.E.2d 419, 426 (Ill. App. Ct. 2004)).

Under Illinois law, unjust enrichment is "an equitable remedy that lies where a 'defendant has unjustly retained a benefit to the plaintiff's detriment and ... the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 455 (7th Cir. 2012) (quoting *A.P. Properties, Inc. v. Rattner*, 960 N.E.2d 618, 621 (Ill. App. Ct. 2011)). A "cause of action based upon unjust enrichment does not require fault or illegality on the part of [the] defendants; the essence of the cause of action is that one party is enriched and it would be unjust for the party to retain the enrichment.'" *Eighteen Investments, Inc. v. NationsCredit Fin. Servs. Corp.*, 876 N.E.2d 1096, 1103 (Ill. App. Ct. 2007) (citing *Fortech, L.L.C. v. R.W. Dunteman Co.*, 852 N.E.2d 451 (Ill. App. Ct. 2006); *Stathis v. Geldermann, Inc.*, 692 N.E.2d 798 (Ill. App. Ct. 1998)).

Describing an "implied-in-law theory" as synonymous with claims "in quantum

meruit, quasi-contract, or one for unjust enrichment," the Seventh Circuit has stated that where plaintiffs ask "the court to remedy the fact that the defendant was 'unjustly enriched' by imposing a contract," the "plaintiffs must show (1) that they performed a service to benefit the defendant; (2) they performed the service non-gratuitously; (3) the defendant accepted their services; and (4) no contract existed to prescribe payment for this service." *Marcatante v. City of Chicago, Ill.*, 657 F.3d 433, 443 (7th Cir. 2011) (citing *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 931 N.E.2d 810, 825 (Ill. App. Ct. 2010)). However, there "can be no contract implied in law where an express contract or a contract implied in fact exists between the parties and concerns the same subject matter." *Marcatante v. City of Chicago, Ill.*, 657 F.3d 433, 443 (7th Cir. 2011) (citing *Zadrozny v. City Colls. of Chi.*, 581 N.E.2d 44, 47 (Ill. App. Ct. 1991)). Additionally, since the "principle behind recovery in quantum meruit is that the defendant has received a benefit and it would be unjust for the defendant to retain the benefit without compensating the plaintiff", in order to recover in quantum meruit, "it is critical that the defendant received some measurable benefit from the services performed by the plaintiff." *Brown v. Saint Xavier Univ.*, 2015 IL App (1st) 142824-U (Ill. App. Ct. 2015) (rejecting claim where would-be professor failed to allege that university had used or received any benefit from materials he purportedly prepared in anticipation of retracted employment).

**The Contribution to the Purchase Price.** The court concludes from the evidence presented that Claimants contributed the $5,000 earnest money deposit and an additional $70,000 at closing toward the down payment to enable the Debtor to

purchase the Oak Creek Residence in 2013. The evidence shows that the Jones' contribution was not a pre-payment of rent. Further, it is undisputed that the Debtor was aware of and accepted the Claimant's contributions towards his purchase. It is also uncontroverted that the Claimants did not intend their contribution to be a gift. Nearly four years later Mr. Rowell sold the property to a third-party for profit.

The Debtor acknowledges that his net profit from the 2017 sale is sufficient to reimburse the Claimants for the funds contributed to enable him to make the purchase. Instead, he argues that he should retain his profit to offset personal taxes and penalties he incurred over the years for withdrawing funds from his 401(k) account in connection with his ownership of the property, including the income tax he paid from rent he received from the Claimants and the capital gains tax he incurred on the sale. The Debtor, however, failed to establish these amounts by a preponderance of the evidence, much less present a legal or equitable basis for the subordination of the benefit he received from the Claimant's contribution to the purchase of the property to his personal expenses.

Thus, the evidence shows that the Debtor profited from the sale of the Oak Creek Residence as a result, in part, of the Claimant's contributions of $75,000 to enable him to purchase the property. The evidence further shows that the Claimants did not provide the funds gratuitously and that the Debtor applied the funds to his purchase aware of the Claimants belief that their funds would be used to acquire the property that they later could buy from him. Under these circumstances the court finds it unjust to permit the Debtor to retain his profit from the sale of the property

without compensating the Claimants for their contribution. Therefore, the Claimants' unjust enrichment claim will be allowed in the amount of their $75,000 contribution toward the Debtor's purchase of the Oak Creek Residence.[19]

**Repairs and Improvements.** The next portion of the disputed claim seeks reimbursement for the Claimants' expenditures for various repairs and improvements to the home. They have proved a claim in restitution for three expenses which they incurred in May 2017 to enable the Debtor to sell the property. At the time, the Debtor's sale of the Oak Creek Residence to the third party was imminent and Mr. Rowell had asked the Claimants to move. The Debtor testified that he required the Claimants to be out of the house before the sale closed. He also testified that the repairs were necessary to close the sale, that Mr. Jones paid for the repairs, and that Mr. Jones "submitted paperwork showing that these were repairs made" and they were necessary, "otherwise the buyer of the property would not accept it." (Trial Tr. 63.) The Claimants were working with him to do whatever was necessary "in order to maximize any profit, that's what had to be done to make the sale. And he agreed with me to do it." (Trial Tr. 63.) Further, Mr. Jones' testimony regarding the repairs and inspections he contracted for and the expenses he incurred

---

[19] The parties in their submissions have alluded to "conversion" as an alternative ground for the Claimants' claim for the $75,000. However, they did not mention this ground in their proof of claim. Conversion is not mentioned in the Debtor's pretrial statement (ECF No. 89) and the Claimants failed to file one. In the Claimants' post-trial brief, however, they argue that they have "identif[ied] the $80,000 used towards the purchase of the property and the $9,789 used to complete the sale of the property as the amount subject to conversion." (ECF No. 96). It is unclear what the "$9,789" refers to, but the court is already allowing a restitution claim for the down payment and escrow, found to total $75,000. To the extent the $9,789 refers to the expenses incurred by the Claimants in connection with the 2017 sale, only $1,039 were proved and are part of the allowed restitution claim.

at the request of the Debtor and insistence of the third-party buyer, is uncontroverted. According to Mr. Jones, he and his wife paid for this work because the Debtor made it clear "that we had to get it done" (Trial Tr. 101) and the Claimants "didn't want to lose that buyer for the home." (Trial Tr. 102.)

The evidence further shows that the $1,039 the Claimants paid for the septic repairs, chimney flashing and chimney inspection in May 2017 was not gratuitous and not shown to be required under the terms of the lease. Rather, the evidence shows that the Claimants acted to enable the Debtor to close on his sale of the property. Further, under the circumstances, the court finds it unjust to permit him to retain his profit from the sale without compensating the Claimants. Therefore, their claim for $1,039 for reimbursement of expenses directly related to and in contemplation of the 2017 sale is allowed.[20]

Not so for the Claimants' reimbursement claim for expenses incurred for other repairs, maintenance items, improvements and alterations during the time they lived in the house, including their replacing windows and flooring and remodeling the kitchen. Neither unjust enrichment nor quantum meruit theories may be used to support a claim "governed by an express contract." *Hess*, 668 F.3d at 455 (citing

---

[20] At least one appellate court case suggests that the standard of damages is different under the theories of quantum meruit and unjust enrichment, stating that in "a quantum meruit action, the measure of recovery is the reasonable value of work and material provided, whereas in an unjust enrichment action, the inquiry focuses on the benefit received and retained as a result of the improvement provided by the contractor. *Hayes Mech., Inc. v. First Indus., L.P.*, 812 N.E.2d 419, 426 (Ill. App. Ct. 2004) (citing 66 Am. Jur. 2d Restitution and Implied Contracts § 9 (2001)). Here, however, there is no evidence to suggest that the cost of the repairs was unreasonable, that they were not necessary for the sale or that they did not increase the sale price of the home by at least the cost of the repair. The Claimants have therefore demonstrated their right to claim the $1,039 reimbursement whether evaluated on the basis of the value of the work or the amount of sale proceeds.

*Stathis v. Geldermann, Inc.*, 692 N.E.2d 798, 812 (Ill. App. Ct. 1998) (unjust enrichment); *Keck Garrett & Assoc., Inc. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) (quantum meruit)). The parties' written lease agreement does not provide for compensating tenants for work performed on the property. (Ex. C, ¶¶ 20-21.) Indeed, with the exception of "[m]ajor maintenance and repair of the Premises," the lease assigns the tenants the responsibility of all necessary repairs "at TENANT'S own expense." *Id.* Further any "alterations, changes or improvements" made to the premises by the Clamants with few minor exceptions, become the landlord's property. *Id.*

The Claimants failed to demonstrate unjust enrichment or grounds for restitution regarding their expenses for their other repairs and improvements. The scant evidence about this work does not suggest that that it was done at the insistence or request of the Debtor to enable him to close his sale of the property in 2017. The Claimants do not suggest that the Debtor instructed them to do this work. Although the testimony reveals that at least in some instances, the Debtor was aware of this work and did not order them to stop or complain, the Claimants do not allege that the Debtor agreed to reimburse nor prove that the Debtor unjustly benefited from the repairs and improvements that the Claimants themselves enjoyed.

As such, the Claimants fail to demonstrate they have an equitable right to reimbursement for the amounts they spent for these remaining repairs and improvements to the residence during their occupancy. Accordingly, they will not be allowed to maintain this portion of their claim. This is not an unfair result because

the Claimants themselves benefited from and enjoyed "the comforts" of these repairs and improvements at least while they were living in the residence. *See, e.g., McDaniel v. Silvernail*, 346 N.E.2d 382, 386 (Ill. App. Ct. 1976) (rejecting claim in quantum meruit for cost and time that tenants expended making repairs). As the Illinois appellate court found in *McDaniel*, "[t]here is no 'failure of justice' in this situation."

## CONCLUSION

Therefore, Claim 2-1 will be allowed as an unsecured claim in the amount of $76,039. The remainder of the claim will be disallowed, the Debtor's objection to said remainder being SUSTAINED. A separate order shall be entered giving effect to the determinations reached herein.

DATE: August 29, 2019

ENTER:

Thomas M. Lynch
United States Bankruptcy Judge